**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FLAIR AIRLINES LTD.,                ) <br>     A Canadian Corporation    ) <br>                             ) <br>          Plaintiff,            ) <br>   v.                           ) <br>                             ) <br> GREGOR LLC, an Illinois Limited Liability  ) <br> Company, VACABO SERVICES LLC (aka   ) <br> VACABO TRAVEL), an Illinois Limited    ) <br> Liability Company,  DUSAN MILICEVIC,  ) <br> and individual AND FROSKA MITEVA, an  ) <br> individual,                      ) <br>                             ) <br>          Defendants.         ) <br>                             ) | Civil Action No.: 18-cv-2023 <br><br> JURY TRIAL DEMANDED |

### COMPLAINT

Flair Airlines Ltd., by its undersigned attorneys, complains against defendants Gregor

LLC, Vacabo Services LLC (aka Vacabo Travel), Dusan Milicevic, and Froska Milicevic, as

follows:

### THE PARTIES

1.      The Plaintiff, Flair, is a corporation incorporated pursuant to the laws of the

Province of British Columbia with a registered business office located in Kelowna, British

Columbia. Flair operates scheduled airline passenger services, as well as chartered passenger and

cargo services in Canada, including in British Columbia, Alberta, Manitoba, Ontario, and in the

United States, the Caribbean region, and to destinations worldwide.

2.      Defendant Gregor LLC ("Gregor"), is a limited liability company organized

pursuant to the laws of Delaware with its business office located at 300 N. LaSalle Street, Suite

4925, Chicago, Illinois. Gregor carries on business as a web designer and developer focused on digital marketing, with particular expertise in the airline industry.

3.     Defendant Vacabo Services LLC ("Vacabo"), also known as Vacabo Travel, is a limited liability company organized pursuant to the laws of Illinois with offices located at 1034 Busse Highway, Park Ridge, Illinois, United States of America. Vacabo operates an online service that provides air, hotel, and car rental reservations.

4.     The Defendant, Dusan Milicevic ("Dusan"), is an individual and resides in or about Chicago Illinois. At all material times, Dusan was and is the director and/or officer of Gregor and Vacabo and acts as each corporation's controlling mind.

5.     The Defendant, Froska Miteva ("Froska"), is an individual and resides in or about Chicago Illinois. At all material times, Froska was and is the spouse of Dusan.

## STATUTORY BASIS AND NATURE OF ACTION

6.     This is an action for unfair competition under 15 U.S.C. § 1125(a).

7.     This is further an action for cybersquatting under 15 U.S.C. § 1125(d).

8.     This is further an action for unfair competition under 815 ILCS 510/2.

## JURISDICTION AND VENUE

9.     The court has personal jurisdiction over Gregor in that it is a Delware limited liability company with its prinicipal place of business in this district.

10.     The court has personal jurisdiction over Vacabo in that it is an Illinois limited liability company entity with its principal place of business in this district.

11.     The court has personal jurisdiction over Dusan in that he is an Illinois resident and resides in this district.

12.    The court has personal jurisdiction over Froska in that she is an Illinois resident and resides in this district.

13.    The court has subject matter jurisdiction over the federal unfair competition and cybersquatting cause of action under 28 U.S.C. § 1331.

14.    The court has subject matter jurisdiction over the cause of action of common law unfair competition under 28 U.S.C. § 1367.

15.    Venue is proper in this district under 28 U.S.C. § 1391 in that each of the defendants resides in Illinois, and because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated in this district.

## BACKGROUND

16.    Since September 2005 until June 2017, Flair operated its online presence with its URL domain names Flairair.ca and Flairair2.ca under the name Flair Airlines. Through its exclusive use of the name Flair Airlines, consumers identify the name Flair Airlines with the Plaintiff in this action.  Flair paid for and maintained Flairair.ca and Flairair2.ca, including having exclusive access to and/or control over the passwords and account information, to conduct its business and in particular to allow customers the ability to make reservations online. See Declaration of Daniel J. Scott, Ex. 1, ¶ 3.

17.    In or around June 2017, Flair purchased the interests of NewLeaf Travel, a company that sold individual seats on Flair flights. As a result of the acquisition, Flair became a scheduled airline operation with the capability to book its own passengers into a reservation system and accepted payment from passengers online. As a result of the acquisition of NewLeaf

Travel, Flair obtained a number of trademarks and internet domains and domain names. See Declaration of Daniel J. Scott, Ex. 1, ¶ 4.

18.     Throughout 2017, Flair planned a migration from the branding of NewLeaf Travel to a new Flair website to generate more online bookings through a robust internet booking engine (the "Migration"). The development of Flair's new internet booking engine would allow Flair to centralize, streamline and improve connections with its reservation system, allowing Flair to take greater control of its customer experience and sales capabilities. The new infrastructure that Flair envisioned through the Migration would create a platform that would directly connect Flair with Online Travel Agencies ("OTA") to reduce the cost of the distribution of sales via OTAs by over 40%. The end goal would allow Flair to generate its own revenue through online sales and put it in a position to create unique travel packages for its customers, rather than using the services of OTAs such as Expedia.

19.     To assist with the Migration and rebranding, Flair retained the services of Dusan, Gregor and Vacabo.

20.     The Defendants, Gregor and/or Dusan, agreed that they would provide to Flair its consulting expertise with respect to Flair's new website, reservation system and passenger sales ("Consulting Agreement"). See Declaration of Daniel J. Scott, Ex. 1, ¶ 7.

21.     The Defendants, Vacabo and/or Dusan, agreed to provide to Flair its services to manage and operate a call center that handled Flair passenger concerns. Vacabo further agreed to manage and supervise all e-mail inquiries received from passengers on behalf of Flair. Vacabo therefore had access to the e-mail address, support@flairair.ca, the e-mail address that was provided to Flair passengers and customers (the "Outsourcing Call Center Support Agreement").

22.     The parties did not execute a formal, written contract with respect to their Consulting Agreement and/or their Outsourcing Call Center Support Agreement, but governed their relationship in accordance with certain general principles as outlined in a draft copy of a Master Agreement for Outsourcing Call Center Support (the "Master Agreement") drafted by Vacabo. See Declaration of Daniel J. Scott, Ex. 1, ¶ 9.

23.     Notwithstanding the fact that there was no formal, written contract that governed the parties' relationship, it was understood, among other things, that: (a) Vacabo would not acquire any right to any trademark, service mark, copyright, patent or other form of intellectual property of Flair; and (b) Vacabo would not use such intellectual property in any manner except in the performance of its obligations as agreed to by the parties.

24.     The Master Agreement supported the intentions of the parties that all work that was performed by Gregor, Vacabo and/or Dusan, would be for the sole benefit of Flair, and that any works acquired or produced would be the exclusive property of Flair. In particular, Section 7.2 of the Master Agreement, explicitly provided that any Work Product (as defined in the Master Agreement) that was paid for by Flair would be disclosed and furnished to Flair. Section 7.2 further provided that Vacabo would assign and does assign all right, title and interest to any Work Product.

25.     It was therefore understood by the parties that Gregor, Vacabo and/or Dusan would work as a service provider and/or consultant to Flair. To assist with Gregor, Vacabo and/or Dusan's work for and within Flair, Dusan was provided an internal e-mail address to allow him to connect with Flair employees and external businesses that were assisting with the Migration.

26.     Employees of Gregor and/or Vacabo were also aware of the relationship that was maintained between Gregor, Vacabo and/or Dusan, and that all intellectual property or otherwise,

used for work with respect to Flair was the sole property of Flair. In a Press Release from Flair on November 15, 2017 on its previous website, one of Dusan's employees stated and identified themselves as the Director of Passenger Sales and Marketing and Flair Airlines. This Press Release remains on the website.

27.     With respect to any work done in relation to the Flair Domain Names. Gregor, Vacabo and/or Dusan's service was paid on a fee for service arrangement to work on the accounts on behalf of Flair.

28.     At all material times, Gregor, Vacabo and/or Dusan held themselves out as being consultants and/or service providers for Flair, all of whom provided said services on Flair's behalf. A copy of Dusan's LinkedIn Profile, pulled on February 28, 2018, shows that Dusan identified himself as being a Director of Business Development within Flair. See Declaration of Daniel J. Scott, Ex. 1, ¶ 15.

29.     Between February 16, 2017 to January 31, 2018, Flair has paid to Gregor, Vacabo and/or Dusan a total of $791,736.42 USD for their services pursuant to the Consulting Agreement, Outsourcing Call Center Support Agreement and the Master Agreement.

30.     At no point in time has Flair failed to pay any legitimate invoices. See Declaration of Daniel J. Scott, Ex. 1, ¶ 16.

31.     As a part of its Consulting Agreement with Flair, Gregor and/or Dusan were to assist Flair in negotiating and acquiring the Flair Domain Names and developing the new Flair online reservation system.

32.     In or around September 2017, on behalf of Flair, Gregor and/or Dusan obtained the Flair Domain Names from David Bedford, an individual who resides in Burnaby, British Columbia. At all material times, Dusan communicated that he is and was acting for his clients,

negotiating and acquiring on behalf of his "client" (Flair). See Declaration of Daniel J. Scott, Ex. 1, ¶ 18.

33.     In exchange for the Flair Domain Names, Flair agreed to pay Mr. Bedford $1,000.00 USD for flairairlines.com and $1,000.00 USD for flairairlines.ca. On or about October 2017, Flair paid said amounts for the procurement of the domains by way of invoice from Gregor, as an invoiced expense of Gregor. See Declaration of Daniel J. Scott, Ex. 1, ¶ 19.

34.     After acquiring the Flair Domain Names, Dusan registered the Flair Domain Names in his name, despite being required to register in Flair's, with GoDaddy.

35.     In September 2017, Dusan worked with John Gibson and Keith Hind of Flair's IT vendor, Northern Computer, and Jim Hicks Manager, Information Technology/Airports of Flair. This group was to consolidate all the Flair URL domains, including flairairlines.com and flairairlines.ca, to point to the new Flair website and reservation system at flairairlines.com and flairairlines.ca.

36.     The Flair Domain Names were to be registered by Gregor and/or Dusan on Flair's behalf. Gregor and/or Dusan were to provide all said registration confirmation, usernames and passwords in order to operate the same for Flair's business purposes.

37.     Gregor and/or Dusan also registered all internet domain names that Flair obtained through NewLeaf Travel as a result of its acquisition of the company. Gregor and/or Dusan registered twenty-six (26) internet domain names from NewLeaf Travel (the "NewLeaf Domain Names") and were to have these internet domain names be redirected and/or or pointed to Flair's new website, flairairlines.com and flairairlines.ca, in an effort to increase sales.

38.     At the time, it was understood by all parties that Flair would have complete access, control, ownership, title and interest to the Flair Domain Names and NewLeaf Domain

Names, including having the Flair Domain Names registered with GoDaddy under Flair's credentials and contact information. In turn, all URLs were to point and/or direct all traffic to the new primary domain/website, flairairlines.com in order to capture all internet traffic.

39.     In and around November 14, 2017, Flair began using the Flair Domain Names as its primary website and URL domain name which could be accessed by the public to make reservations on scheduled Flair flights.

40.     In and around January 15, 2018. Daniel J. Scott, Flair's new Chief Executive Officer, began a review and inspection of Flair and its operations and determined that there had been and continued to be numerous major internal complaints about the call center operated by Vacabo pursuant to the Outsourcing Call Center Support Agreement and the Master Agreement.

41.     Mr. Scott discovered that there had been numerous delays in answering calls and that customer inquiries and complaints received through Flair's website remained unaddressed by Vacabo, despite having agreed to do same.

42.     In or around January 18, 2018, Mr. Scott attended a site inspection with a Flair contract consultant, Julie Rempel, at Vacabo's offices located at 1034 Busse Highway, Park Ridge, Illinois.

43.     During the site inspection, Mr. Scott observed that only one person was staffing the call center phones.

44.     During the site inspection Ms. Rempel and Mr. Scott met with Dusan who represented that Vacabo was dropping an estimated 75% of all inbound calls a day.

45.     Mr. Scott advised Dusan that Flair would eventually bring the call center in-house.

46.    At no time during the site inspection did Mr. Scott advise Dusan that Flair intended to terminate its relationship with Gregor, Vacabo and/or Dusan.

47.    In or around January 19, 2018, Dusan sent Mr. Scott an e-mail with a Notice of Termination for all services provided by Gregor and Vacabo. See Declaration of Daniel J. Scott, Ex. 1, ¶ 30.

48.    In or around January 21, 2018, Dusan sent Mr. Scott another e-mail advising that Vacabo would not be able to provide support to Flair for its sales within the United States of America starting the next day. See Declaration of Daniel J. Scott, Ex. 1, ¶ 31.

49.    In or around January 22, 2018, Mr. Scott responded to Dusan's e-mails with respect to the termination of services of Gregor, Vacabo and Dusan to Flair, and advised Dusan that Flair would be willing to work with them to make a "professional, timely and orderly transition" of their services to Flair and acknowledged a need for a settlement agreement. See Declaration of Daniel J. Scott, Ex. 1, ¶ 32.

50.    In or around February 9, 2018, Mr. Scott contacted GoDaddy to make a Change Update Request, such that all Flair Domain Names and the accounts and passwords related to same (the "Flair Domain Information") were registered to Flair.

51.    GoDaddy responded to Mr. Scott's request stating that it could not make the requested change until it received consent from the registrant and that consent was not provided. See Declaration of Daniel J. Scott, Ex. 1, ¶ 33.

52.    In or around February 12, 2018, Dusan informed Mr. Scott that he, Gregor and/or Vacabo had taken full control of the Flair Domain Names and that he had refused and was refusing to provide the necessary information to Flair despite numerous requests for same.

53.     Thereafter, Mr. Scott instructed Northern Computer, Flair's IT vendor, to verify whether Flair had access to the Flair Domain Names.

54.     In or around February 13, 2018, Northern Computer advised Mr. Scott that they had performed a search of the mailboxes of Flair employees, Chris Lapointe, Jim Hicks, Sandro Banducci, Steve Goodnick and David Atkins, which employees were engaged with Dusan, Gregor and/or Vacabo prior to them terminating their agreements with Flair. Northern Computer advised Mr. Scott that they were not able to find the Flair Domain Information. See Declaration of Daniel J. Scott, Ex. 1, ¶ 35.

55.     As a result, Mr. Scott contacted Flair's solicitor, Imran Ahmad of Miller Thomson LLP, to assist in obtaining the Flair Domain Information. Mr. Ahmad immediately contacted the Internet domain registrar, GoDaddy, to obtain the Flair Domain Information and gain access to the Flair Domain Names.

56.     In or around February 14, 2018, GoDaddy advised that it was not able to provide the Flair Domain Information or make any changes to the domain names and their respective registrations without consent from the registrant. GoDaddy informed Mr. Ahmad that Flair did not have the authority nor was it named as the registrant for the Flair Domain Names. GoDaddy further advised Mr. Ahmad that it would not be able to make any changes to a domain without direction from a court or arbitration forum. See Declaration of Daniel J. Scott, Ex. 1, ¶ 37.

57.     Unable to obtain the Flair Domain Names and the Flair Domain Information from GoDaddy, Flair continued to make requests for same from Gregor, Vacabo and/or Dusan. In response to Flair's requests for the Flair Domain Information from Dusan, Gregor and/or Vacabo, in or around February 15, 2018, Dusan e-mailed Mr. Scott and Jerry Presley, the Executive Chairman of Flair, demanding that Flair pay to Dusan $400,000.00 USD for alleged outstanding

invoices and as a termination fee as a result of Flair's alleged failure of its commitments to Gregor and/or Vacabo. In Dusan's e-mail, he advised that upon payment, that Flair would receive:

> ...all items they asked for and any and all work product generated during the time Gregor/Vacabo provided services including any right to the intellectual property creating during such term..."

See Declaration of Daniel J. Scott, Ex. 1, ¶ 38.

58.     In or around February 15, 2018, Chris Lapointe, Vice-President of Commercial Operations at Flair, received an e-mail from Dusan, who threatened that Flair needed to pay him: "They don't make a payment it's a no – *and we proceed with a shutdown tomorrow before end of business hours.*" See Declaration of Daniel J. Scott, Ex. 1, ¶ 39.

59.     In or around February 16, 2018, Mr. Presley e-mailed Dusan advising that Flair would immediately pay to Gregor, Vacabo and/or Dusan $47,035.70 USD on the outstanding invoice bearing number 1052 to accommodate final staff payments, departure and for Gregor, Vacabo and/or Dusan to provide immediate access to allow Flair to take possession and control of the Flair Domain Names. See Declaration of Daniel J. Scott, Ex. 1, ¶ 40.

60.     In or around February 16, 2018, Dusan replied to Mr. Presley's e-mail advising that he could not do what Mr. Presley had proposed and provided that the 'Termination fee payment would get you the access to everything you are asking for." See Declaration of Daniel J. Scott, Ex. 1, ¶ 41.

61.     Following Mr. Presley's e-mail to Dusan on February 16. 2018, offering to pay, under duress, $47,035.70 USD, See Declaration of Daniel J. Scott, Ex. 1, ¶ 42, Mr. Presley wrote to Mr. Scott with an update on discussions and correspondence he had been having with Dusan. In particular, in or around February 18, 2018, Mr. Presley informed Mr. Scott that he was advised

by Dusan that Flair was to agree to a settlement agreement by noon on February 16, 2018, failing which he would "shut down the servers on which the Flair Airlines reservation system are located." Again, under duress and upon hearing Dusan's threats, Mr. Presley advised that he offered to send Dusan $79,646.02 USD in exchange for the Flair Domain Names. See Declaration of Daniel J. Scott, Ex. 1, ¶ 42.

62.     On information and belief, Gregor, Vacabo and/or Dusan, are intentionally and maliciously acting in a way designed to cause damage to Flair and to leverage their retention of the Flair Domain Names and Flair Domain Information in an effort to obtain additional funds from Flair.

63.     The misconduct and unlawful actions of Dusan as described herein were not his first attempts to purposefully and maliciously convert Flair's property, intellectual and otherwise, for his own self-serving purposes and/or to leverage further and unjustified payments from Flair.

64.     In or around early February 2018, it came to the attention of Flair that the various NewLeaf Domain Names acquired by Flair that assisted in driving customers to the Flair web-site, were also in the complete and total control of Dusan, Gregor and/or Vacabo. Upon terminating all agreements with Flair, Dusan, the only individual with unfettered access to manipulate and alter passwords to the NewLeaf Domain Names, made changes to the registration and account information relating to all NewLeaf Domain Names registered with GoDaddy.

65.     Unable to access the NewLeaf Domain Names, Flair also contacted GoDaddy to identify the issue and was informed that the registrant for the NewLeaf Domain Names were recently changed from being in Dusan's name to that of his spouse, Froska. Flair was only able to have the NewLeaf Domain Names transferred back to them and registered in Flair's name upon demonstrating to GoDaddy that it had made ongoing payments for the NewLeaf Domain Names

from its accounts and therefore are the lawful and proper owner to the NewLeaf Domain Names. See Declaration of Daniel J. Scott, Ex. 1, ¶ 46.

66.     On information and belief, Dusan's actions since his having terminated all agreements and relations with Flair are with malice and with the intent to cause irreparable harm and damage to Flair.

67.     At no point has Flair consented to its intellectual property being registered to any person, other than Flair itself, let alone, allowing a contractor to transfer said property to a third party.

68.     Flair's online presence serves a significant purpose to its operations and business, including the convenience for passengers, globally, to access their services, schedule and reserve flights. As a result of the Defendants' conduct, Flair is presently experiencing a major disruption in providing said services because the Defendants' refuse to return the Flair Domain Names and Flair Domain Information.

69.     Presently. the domain names, flairairlines.com and flairairlines.ca, are fully operational to the public with Dusan keeping a non-functioning Flair Airlines reservation system on these URLs. This action is confusing to the public who believe the Flair Airlines' site is not functional. Customers wishing to access Flair services cannot do so via their online platform as the Defendants' have complete and total control and/or access to the Flair Domain Names and therefore are the only parties that may administer and update the websites as necessary.

70.     Flair is being prevented from using its assets for legitimate business purposes, causing substantial losses and irreparable harm,

71.     Having regard to the above, Flair will continue to suffer irreparable harm that is not compensable by an award of damages.

72. Flair is a new and emerging airline company and is the only ultra-low cost carrier airline operating in Canada. In the coming months, two ultra-low cost airlines will be entering the market (Swoop and Canada Jetlines). If Flair is unable to secure its market position before these entrants start operating, Flair's business will be completely decimated.

73. Flair's current online reservation system and presence generally is the result of carefully planned and executed business strategy over the last two (2) years. Without the release and return of the Flair Domain Names, Flair stands to lose hundreds of thousands of dollars a month, as well as suffer significant damage to its reputation as a newcomer to an intense and highly competitive industry.

74. Through careful planning and strategy, Flair has started a transition away from typical airline platforms that provide passengers with online options to reserve scheduled flights. Under the Migration, Flair was to eliminate and/or minimize the number of indirect sales it received from Internet based bookings by maintaining an online system in-house and which received payments from passengers directly. To ensure the success of said system, Flair has worked to execute a tactical marketing plan to generate online traffic to its websites, flairairlines.com and flairairlines.ca.

75. Without access to the Flair Domain Names, in or around February 19, 2018, Flair was forced to start new online operations through the website flairair.ca. Despite having another internet domain name up and running, the lack of access to the Flair Domain Names has had and continues to have a significant impact on the amount of traffic online and therefore the number of sales secured online. With multiple Flair websites available to passengers, there is product confusion, as flairairlines.com and flairairlines.ca have not been updated nor are they functional to take a reservation. These sites sit online in Flair Airlines' name and only serve to confuse the

public, reduce the opportunity for Flair Airlines to complete an online sale, and hurt Flair Airlines reputation.

76.    On February 19, 2018, the day prior to Flair losing control of the website on the URLs flairairlines.com and flairairlines.ca, the Flair website had $63,645.21 of website sales. On February 20, 2018, the day Flair lost control of these URLs. Flair's online sales via the web-site decreased by 53% to $29,331.23. To compensate for the loss of web-site sales, Flair is currently spending additional funds on Google related functions that help passengers find the Flair web-site located on the URL fairair.ca.

77.    A general search on alexa.com, a service operated by Amazon to provide statistical and analytical information for websites across the world, provided that as of March 4, 2018, the website flairairlines.com is ranked as numbers 161,638 globally and 4,454 in Canada based on its daily visitors. There was no information available for flairairlines.ca given that it is a domain name pointed to flairairlines.com. See Declaration of Daniel J. Scott, Ex. 1, ¶ 59.

78.    In comparison, as of March 4, 2018, the website currently used by Flair, flairair.ca, is ranked as numbers 1,066,969 globally and 13,405 in Canada based on its daily visitors. There was no information available for flairair.com given that it is a domain name pointed to flairairlines.com. From review of the statistics from alexa.com, nearly six (6) times the amount of people online visit flairairlines.com rather than flairair.ca. See Declaration of Daniel J. Scott, Ex. 1, ¶ 60.

79.    In or around February 19, 2018, when Flair was forced to transition back to flairair.ca, the website, flairair.ca started off at zero hits and/or online visitors and it took four (4) days to climb to 10,000 hits and/or online visitors and settled at 6,000 hits and/or visitors by the end of the week. In comparison, flairairlines.com was receiving roughly 15,000 hits per day for

the month of February, 2018 prior to February 19, 2018 transition date. Since having transitioned to flairair.ca, Flair has lost roughly 60,000 hits and/or online visitors, and therefore potential sales. Without regaining control of the Flair Domain Names, Flair will not likely be in a position to increase the number of web visitors. See Declaration of Daniel J. Scott, Ex. 1, ¶ 61.

80.     With an inability to properly access, operate and maintain the Flair Domain Names, there will be a major delay in Flair being able to provide services to its customers and passengers. Said delay and/or absence would mean a reduced ability to serve customers and passengers, loss of customer confidence, loss of time and exposure to liability in the event that the Defendants' publish and/or cause to be published any content on the respective websites.

81.     Gregor, Vacabo and/or Dusan are well aware of the significance of the Flair Domain Names and the potential profits that Flair could and/or would have derived from them. In or around February 14, 2017, after Dusan terminated all agreements with Flair, he wrote to Mr. Lapointe, copying Mr. Presley, advising that through their website and the internet booking engine used, Flair would have expected $400,000.00 to $600,000.00 per month in gross sales. See Declaration of Daniel J. Scott, Ex. 1, ¶ 63.

82.     Dusan has also personally acknowledged that his actions are causing significant damage to Flair, including decrease in sales on Flair flights. In or around February 17, 2018, after Dusan terminated **all** agreements with Flair, Dusan e-mailed Mr. Presley, advising that the company needed to take action with respect to its sales. In particular, Dusan wrote to Mr. Presley stating that "Flair won't survive for another few weeks with these sales." See Declaration of Daniel J. Scott, Ex. 1, ¶ 64.

83.     In and around early February, Ms. Rempel, reported to Mr. Scott a number of text messages she had received from Dusan outlining his attitude and displeasure with Flair. He wrote

to Ms. Rempel, that Flair needs to "sign the document" and that "...they sign — they pay — we transition," suggesting that upon payment, he will release the Flair Domain Names. Dusan also wrote to Ms. Rempel stating that he was in "no hurry about Flair" and that Flair should "first absorb the reality and then we gonna figure it out." See Declaration of Daniel J. Scott, Ex. 1, ¶ 66.

84.     On information and belief, Dusan intends to withhold the Flair Domain Names until he receives payment and that he intends to do so without any regard to the consequences and damages that Flair may incur as a result.

85.     Flair has lost and continues to lose revenue and incur expenses in connection with its inability to control and maintain the Flair Domain Names and/or its online scheduling and reservation system.

86.     Defendants will suffer no hardship if compelled to return and disclose the Flair Domain Names and Flair Domain Information.

87.     The Defendants have no legitimate purpose to holding any property, while failing to deliver the same could have business-ending consequences.

88.     Flair has common law trademark rights in the FLAIR AIRLINES mark.

89.     Flair's FLAIR AIRLINES mark is distinctive and acquired such distinctiveness prior to Defendants' use of the Internet domain names flairairline.com and flairairilne.ca.

90.     On March 20, 2018, Flair filed trademark application serial no. 87842097 for its Flair Airlines mark. Flair asserts a first use in commerce of September 25, 2005 for air transportation, air transportations of passengers and freight, air transportation services for cargo, and for providing a website featuring information in the field of air transportation.  See Ex. 2.

## COUNT I
## VIOLATION OF THE LANHAM ACT
## CYBERSQUATTING

91.     Plaintiff incorporates herein and re-alleges the foregoing paragraphs as if fully set forth herein.

92.     Defendants have a bad faith intent to profit from the registration and use of the Internet domain names flairairline.com and flairairline.ca by creating an association with Plaintiff's FLAIR AIRLINES trademark as to source or sponsorship.

93.     The second-level domain name portion of the flairairline.com and flairairilne.ca Internet domain names is confusingly similar to Plaintiff's FLAIR AIRLINES trademark.

94.     The registration and use of the Internet domain names flairairline.com and flairairilne.ca violate Plaintiff's rights as the owner of the FLAIR AIRLINES trademark.

95.     Plaintiff has been damaged by Defendants' unlawful use of the flairairline.com and flairairilne.ca domain names and will suffer irreparable harm.

96.     Defendants' acts, as aforesaid, are in violation of the Anticybersquatting Consumer Protection Act under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

## COUNT II
## VIOLATION OF THE LANHAM ACT
## FEDERAL UNFAIR COMPETITION

97.     Plaintiff incorporates herein and re-alleges the allegations of paragraphs 1-90.

98.     Plaintiff's FLAIR AIRLINES trademark is entitled to protection under Section 43(a) of the Lanham Act.

99.     Defendants' use and promotion of the FLAIR AIRLINES mark in the Internet domain names flairairline.com and flairairilne.ca is likely to cause confusion or cause mistake, or

deceive as to the affiliation, connection, or association of Plaintiff with Defendants, or as to the origin, sponsorship or approval by Plaintiff of Defendants' website.

100.     Defendants' use of the Internet domain names flairairline.com and flairairilne.ca constitutes a false description of origin, false or misleading description of fact, or false or misleading representation of fact as those terms are used in Section 43(a) of the Lanham Act.

### COUNT III
### ILLINOIS DECEPTIVE TRADE PRACTICES (815 ILCS 510/2)

101.     Plaintiff incorporates herein and re-alleges the allegations of paragraphs 1-90.

102.     Plaintiff's FLAIR AIRLINES trademark is entitled to protection under 815 ILCS 510/2.

103.     Defendants' use and promotion of the FLAIR AIRLINES mark in the Internet domain names flairairline.com and flairairline.ca is likely to cause confusion or cause mistake, or deceive as to the affiliation, connection, or association of Plaintiff with Defendants, or as to the origin, sponsorship or approval by Plaintiff of Defendants' website.

104.     Defendants' use of the Internet domain names flairairline.com and flairairline.ca constitutes a deceptive trade practice as that term is used in 815 ILCS 510/2.

### JURY DEMAND

Plaintiff hereby demands a jury trial on all matters and issues triable by jury.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for an order and judgment:

A.     that Defendants, individually and collectively, have unfairly competed with Plaintiff by way of their use and control of the Internet domain names flairairline.com and flairairilne.ca;

B.      preliminarily and permanently restraining and enjoining Defendants, their its directors, officers, agents, servants, attorneys, employees, parent, subsidiaries, affiliates, related companies, successors and assigns, and all other persons or entities in active concert and/or participation with them who receive notice, from any further unfair competition;

C.      ordering Defendants to immediately transfer all ownership, control, and access to the Internet domain names flairairline.com and flairairilne.ca to Plaintiff;

D.      ordering Defendants to account for and pay to Plaintiff its actual damages by reason of Defendants' unfair competition and cybersquatting, and such other damages as appear proper to the Court;

E.      granting plaintiff a judgment, pursuant to 815 ILCS § 510/2, for injunctive relief, costs and reasonable attorneys' fees;

F.      granting plaintiff a judgment for punitive damages in an amount to be determined;

G.      ordering defendant to file in Court and to serve upon plaintiff's counsel, within thirty (30) days after entry of the above injunction, a report in writing, under oath, setting forth in detail the manner and form in which defendant has complied with this injunction;

H.      finding this to be an "exceptional case" within the meaning of 15 U.S.C. § 1117 and awarding reasonable attorneys' fees to plaintiff;

K.      awarding costs to plaintiff; and

L.      granting plaintiff such other and further relief as may be proper under the circumstances.

*      *      *      *

Dated:  March 20, 2018

/s/ John C. Gekas
John C. Gekas – ARDC No. 6281446
Joseph M. Kuo – ARDC No. 6216400
Michael J. Pollock – ARDC No. 6321866
SAUL EWING ARNSTEIN & LEHR LLP
161 N. Clark, Suite 4200
Chicago, IL  60601
Telephone:   (312) 876-7100
Facsimile:   (312) 876-7313
John.Gekas@saul.com
Joseph.Kuo@saul.com
Michael.Pollock@saul.com
*Attorneys for Plaintiff Flair Airlines Ltd.*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual statements set forth in the responses to the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on March 20, 2018.

Daniel James Scott

114788921.1

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was filed with the Court's CM/ECF system and thereby caused to be served on all counsel of record registered to receive such service.

The undersigned attorney further certifies that the foregoing document was served by email on the known counsel of Defendants as follows:

Slaven Ilic, Esq.
ZIA ILIC LTD.
180 N. LaSalle St. Suite 3700
Chicago, IL 60601
T: 312.216.5185
F: 312.546.4815
slaven@ziailic.com

*Attorney for Defendants*

/s/ John C. Gekas