IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **Flair Airlines, Ltd.,** | ) | |
| Plaintiff, | ) | Case No: 18 C 2023 |
| | ) | |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| **Gregor LLC, Vacabo Services, LLC,** | ) | |
| **Dusan Milisevic, and Froska Miteva,** | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, Flair's motion for summary judgment [195] is denied. The parties are directed to appear for a status hearing on July 9, 2019 at 9:30 a.m. in order to set a trial date.

**STATEMENT**

**Facts**

The Court assumes familiarity with the facts of the case and sets forth relevant facts as necessary in the text of the analysis. As brief background, the instant case grew from a poorly-documented and hastily-conceived business relationship between Plaintiff Flair Airlines, Ltd. ("Flair") and Defendants (in particular, Dusan Milisevic and Gregor, LLC) to essentially build a commercial airline. The lack of an express formal structure for the relationship between the parties has led to the instant dispute. Flair moves for summary judgment on its claim of cybersquatting and all of Defendants' state-law counterclaims. Because of the numerous disputed facts, summary judgment is inappropriate.

**Standard**

Summary judgment is appropriate where a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, "[a]ll justifiable inferences are drawn in favor of the non-moving party." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019) (citing *Anderson*, 477 U.S. at 255).

**Analysis**

    A.    <u>Plaintiff's Cybersquatting Claim</u>

While most of the facts in this case are not agreed upon, it is undisputed that at some point in 2017, Gregor, LLC acquired the Flair Domain Names[1] ("FDN") with Flair's knowledge. While Flair asserts that Defendants were told to register the FDN under Flair's name, they did not. In January 2018, when the parties' relationship ended, Defendants, as parties to the purported joint venture, claimed at least partial ownership of the FDN and demanded that Flair pay them prior to turning the FDN over to Flair. Flair then filed suit against Defendants for violations of the Anticybersquatting Protection Act, 15 U.S.C. § 1125(D)(1) ("ACPA"), seeking the immediate transfer of the FDN from Defendants to Flair. According to Flair, "[b]y holding the subject web domains as leverage for their payment demands, Defendants unquestionably violated the [ACPA]." (Pl.'s Mem. Supp. Mot. Summ. J., Dkt. # 196, at 1.)

To establish its cybersquatting claim, Flair must show that: "(i) it had a distinctive or famous mark at the time Defendants registered the domain name; (ii) Defendants registered, trafficked in, or used a domain name that is identical or confusingly similar to Plaintiffs' mark; and (iii) Defendants acted with bad faith to profit from that mark." *Box Acquisitions, LLC v. Box Packaging Prods., LLC*, 32 F. Supp. 3d 927, 939–40 (N.D. Ill. 2014). Assuming *arguendo* that the first two elements are met, summary judgment is precluded based on the bad-faith element. Pursuant to the ACPA:

> In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to–
>
> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of

---

[1] The FDN are: flairair.com; flairairline.co; flairairline.com; flairairline.net; flairairlines.biz; flairairlines.co; flairairlines.com; flairairlines.info; flairairlines.me; flairairlines.mobi; flairairlines.online; flairairlines.org; flairairlines.us; flairairways.com; fly-flair.com; flairairlines.ca; flairairlines.net; flairairlines.solutions; and flairairlinestest.com.

confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125. Under the so-called safe harbor-provision, "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

Flair contends that even if a joint venture existed, Defendants' bad faith is exhibited in the emails that Dusan Milisevic sent to Flair, in which Milisevic states that he would transfer the domain names to Flair in exchange for $300,000.00. Flair asserts that "using [a] website as leverage to obtain reimbursement for . . . work on the site" can support a finding of bad faith. *Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1084 (E.D. Wis. 2014) (citing *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219 -20 (9th Cir. 2010) ("As for whether use to get leverage in a business dispute can establish a violation, the statutory factors for 'bad faith intent' establish that it can.")).

Defendants contend, however, that they entered into a joint venture with Flair, were given responsibility to rebrand the airline and, with Flair's knowledge, acquired the FDN as part of their duties under the joint venture agreement, sometime between February 2017 and January

2018.[2] Thus, Defendants assert, the FDN are property of the joint venture. Flair disputes these facts, but if the jury finds that a joint venture existed, and that the domain names were assets of the joint venture, then a jury could find that Defendants' request to be reimbursed for their portion of the assets owned by the joint venture does not demonstrate bad faith.[3] Because a factual dispute exists regarding the parties' relationship and ownership of the domain names at the time they were acquired, which directly affects the bad-faith analysis for this claim, the Court finds summary judgment on the ACPA claim must be denied.[4] *See Chawla v. Subramanian*, No. CV 13-40113-TSH, 2016 WL 111412, at *2 (D. Mass. Jan. 11, 2016) (denying plaintiff's summary judgment motion on ACPA claim where founder and board members of a cultural organization had a "falling out," and concluding that a factual dispute existed "as to whether [the individual defendant] validly h[eld] any corporate office [and thus] . . . was authorized to act for the corporation, [whether the individual defendant could] . . . be found to have acted in bad faith, and [whether the individual defendant] . . . had the right to use [the organization's] corporate property on her website . . . .").

B.  Defendants' Counterclaims

    1.    <u>Claims Based on Joint Venture</u> (Count II–Third-Party Beneficiary; Counts III & IV–Account Stated; Count VII--Breach of Fiduciary Duty; Count IX–Breach of Joint Venture Agreement)

---

[2] It is undisputed that in February 2017, Gregor (at least, and potentially some or all of the other defendants) and Flair entered into an agreement, the parameters of which are disputed, but included, at least, Gregor's provision of web development, booking engine development, business strategy, and other related services to Flair. (Defs.' Resp. Pl.'s Stmt. Facts, Dkt. # 211, ¶ 14.) It is further undisputed that Gregor acquired the FDN at some point before the relationship ended in January 2018. (*Id.* ¶ 19.) While Flair points to the fact that the United States Patent and Trademark Office ("USPTO") issued trademark registrations for "Flair, "Flair Air," and "Flair Airlines" in March 2018, (Pl.'s Stmt. Facts, Dkt. # 197, ¶ 33; *id.*, Ex. 17, Dkt. # 197-17), that occurred *after* Gregor acquired the FDN.

[3] *See Woods v. Sw. Airlines, Co.*, 523 F. Supp. 2d 812, 826 (N.D. Ill. 2007) ("If events subsequent to the formation of a contract for a joint venture make the accomplishment of the venture's purpose impracticable, the contract terminates and the venture is dissolved. Thereafter, the venture's liabilities are paid and the remaining assets distributed, and the venture terminates.").

[4] Indeed, throughout its memorandum and reply brief in support of its motion for summary judgment, Flair points to testimony that is contradicted by that witness's own testimony or that of other witnesses. It is not the Court's role on summary judgment to judge the credibility of witnesses. Flair's attempts to demonstrate that no genuine issue of material fact exists in fact only serve to emphasize the different stories each side offers in support of its version of events.

Flair argues that no genuine issue of material fact exists with respect to the joint-venture-based claims because "Defendants' joint venture is a sham." (Pl.'s Mem. Supp. Mot. Summ. J., Dkt. # 223, at 6.) "A joint venture exists where there is (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) a provision for joint sharing of profits and losses." *Richard Knorr Int'l, Ltd. v. Geostar, Inc.*, No. 08 C 5414, 2010 WL 3419504, at *6 (N.D. Ill. Aug. 25, 2010) (citation omitted). " The intent of the parties in associating with each other is the most significant element in determining whether a joint venture existed." *Woods,* 523 F. Supp. 2d at 825. "Whether . . . a joint venture exists typically is a question of fact." *Glass v. Kemper Corp.*, 949 F. Supp. 1341, 1345 (N.D. Ill. 1997). "A formal agreement is not essential to establish a joint venture," and "[t]he existence of a joint venture may be inferred from circumstances demonstrating that the parties in fact entered into a joint venture." *Thompson v. Hiter*, 826 N.E.2d 503, 510 (Ill. App. Ct. 2005).

A jury could find that the evidence demonstrates that while the official structure of the parties' relationship was unclear, they had an intent to associate with each other as a joint venture. Christopher LaPointe, Flair's Vice President[5], testified that when he and Milisevic were initially discussing working together, Milisevic "rejected a[n] employment relationship" and that a "vendor relationship was not discussed." (LaPointe Dep., Dkt. # 212-2, at 81.) According to LaPointe, "we came up with a structure that resulted in basically putting together a business that had three, four functions and this was the Vacabo piece," and that "we [Flair and '[Milisevic] and his team or whoever else it was'] would share the ownership of these three entities." (*Id*. at 86, 90-91, 96.) LaPointe further testified that when he and Milisevic began discussions, LaPointe could not "recall having any preconceived notion of what the agreement would look like," but that he knew Flair "needed help" and that he believed "100 percent" that Milisevic could "put a team together in time to save this airline [*i.e.*, Flair] that was going to be successful." (*Id*. at 68.) Indeed, when asked what his understanding was of Gregor's role within the plan that he had created with Milisevic, LaPointe states "it was going to be the shareholder of basically the entity that [Milisevic] would hold his shares in [for] the venture or ventures" which LaPointe was discussing with Milisevic. (*Id*. at 103.) Milisevic also refers to the parties' relationship as a joint venture. (Milisevic Suppl. Decl., Dkt. # 4, ¶ 2.)

These statements are sufficient to create a genuine issue of fact as to whether the parties intended to establish a joint venture. Milisevic's draft Memorandum of Understanding states that one of the services to be provided by Flair is "[s]upporting startup *Joint Venture* 'Vacabo Group of Companies' through partnering with Gregor LLC." (LaPointe Dep., Ex. 3, Mem. Understanding, at 2) (emphasis added). The fact that the Defendants have referred to the relationship in terms other than as a joint venture, or have not used the term joint venture, is not dispositive of the issue. *Hiatt v. W. Plastics, Inc.*, 36 N.E.3d 852, 866 (Ill. App. Ct. 2014) ("A

---

[5] LaPointe also described his role as "the No. 2 guy" and "almost a general manager's role." (LaPointe Dep., Dkt. # 212-2, at 9-10).

5

joint venture agreement need not expressly state that such was intended . . . .") (internal quotation marks and citation omitted). Moreover, that individual members on the Defendants' side of the joint venture did not know how to characterize the parties' relationship in legal terms does not mean that a joint venture did not exist.

As for joint control, this element "requires only 'some right by the parties to direct and govern the conduct of each other in connection with the joint venture.'" *Id*. at 869 (citation omitted). Here, LaPointe's testimony evidences that the parties intended for Flair to provide the funding while Milisevic and his team would provide the know-how. (LaPointe Dep., Dkt. # 212-2, at 63 (LaPointe stating that in his initial discussions with Milisevic: "Flair had essentially next to zero capacity to take on the Newleaf [Airline] operation and run it. I didn't have the expertise; we didn't have the people; we didn't have the systems; we didn't have the technology. So we knew that I knew somebody, I know a guy and that was [Milisevic] who had just finished . . . doing this for [another organization] for three years [–] building of the technology; building out and successfully generating multi-million dollar sales . . . ."); *id*. at 95 ("And what we [LaPointe and Milisevic] talked about was let's use Flair as the beta model because we're running the thing, you're developing the technology; we're going to invest in this; let's invest in it together" with the potential for using the technology for outside parties).) In addition, the draft Memorandum of Understanding states that Gregor agrees to "provide required 'Know How' in [a] *supervisory* role during project." *Id*. (emphasis added). In terms of obligations of the parties, the draft Memorandum of Understanding provides that the parties "*agree to work together* in the true spirit of partnership to ensure that there is a *united* visible and responsive leadership of the Project . . . ." (*Id*. at 1) (emphasis added). Evidence of joint control exists, so summary judgment on this issue is unwarranted.

Further, the inconsistencies in the evidence regarding who on the Defendants' side were actually part of the joint venture do not as a matter of law defeat its existence. Evidence of some type of partnership or joint venture exists. It is up to the factfinder to decide the nature and parameters of that relationship.

Finally, Flair's assertion that summary judgment is appropriate because any joint venture agreement is barred by the statute of frauds also fails. In Illinois, a contract must be in writing unless it is capable of being fully performed within one year. 740 ILCS 80/1. Flair points to Milisevic's testimony that the joint venture was for a three-year term, and says that because it is not in writing, it is barred by the statute of frauds. But simply because one party indicates that the term was for more than one year does not mean that the agreement could not have been performed in less than one year. Indeed, as LaPointe repeatedly testified at his deposition, time was of the essence. (LaPointe Dep. at 78 ("We couldn't stop [operating Flair]. If we had stopped for a day, it would have killed it. . . . We can't stop this and restart in three months when we get our sh** together. We have to keep this thing going, and it was a living breathing organism this business venture so we had no ability to stop.").) Moreover, Milisevic attests that "by December 2017[,] the development process for the Vacabo companies was already 75 to 80 percent complete, in my estimation as the chief on-site manager of that development." (Milisevic Suppl. Decl., Dkt. # 212-4, ¶ 6.)

6

In any event, a genuine issue of material fact exists as to whether there was a writing. "The purpose of the Statute of Frauds is to prevent fraud, not facilitate it." *Benefit Vision Inc. v. Conseco Life Ins. Co.*, No. 12 C 3025, 2014 WL 5614711, at *7 (N.D. Ill. Nov. 3, 2014). "To satisfy the Illinois statute of frauds, the writing 'need not itself be a valid contract, but only evidence of one.'" *Id.* (citation omitted). "In order to satisfy the Statute of Frauds, there must be a writing, not necessarily on a single piece of paper, which is signed by the party to be charged." *Naqvi v. Ill. Health & Sci.*, No. 17 C 3145, 2018 WL 2745897, at *7 (C.D. Ill. June 7, 2018). The Memorandum of Understanding drafted by Milisevic is evidence of an agreement between the parties. Further, as noted by Defendants, LaPointe recommended in a December 2017 email to the new owners of Flair that he wanted to have a discussion with them about the "commercial arrangement between Flair and Vacabo," which he described as a "verbal agreement that has committed [Flair] to a minimum three[-] year term which started last April for them to set up the necessary commercial sales and marketing infrastructure including technology, processes and systems, people and training." (Defs.' Stmt. Add'l Facts, Ex. 10, Dkt. # 212-10, 12/4/17 LaPointe email to J. Scott & J. Pressley.)

Because joint venture agreements can be inferred from circumstances demonstrating that the parties intended to create a joint venture, and construing the facts in a light most favorable to the Defendants, as the Court must at this stage of the proceedings, the Court denies Flair's motion seeking summary judgment on Counts II, III, IV, VII, and IX of the Counterclaim.

2. Unjust Enrichment

Flair next argues that Defendants' unjust enrichment claim fails because Defendants contend that Flair had a "formal agreement" with Gregor and Vacabo, thus defeating the unjust enrichment claim. But Flair argues that no such contract existed, and Defendants state that the claim is pleaded in the alternative. Thus, in the event the jury concludes that no joint venture contract existed, Defendants can seek to proceed with their unjust enrichment claim. *In re First Farmers Fin. Litig.*, No. 14 C 7581, 2016 WL 5940933, at *6 (N.D. Ill. Oct. 13, 2016) ("[C]ourts have permitted an alternative claim of unjust enrichment to go forward when it did not rely on the existence of a valid contract.").

3. Account Stated

Flair asserts that the account stated claim fails because Flair disputed the amounts stated. Under Illinois law, "[a]n account stated has been defined as an agreement between parties who have had previous transactions that the account representing those transactions is true and the balance stated is correct, together with a promise, express or implied, for the payment of such balance." *Oxford Media Grp., Inc. v. Family Worship Ctr. Church, Inc.*, No. 16 C 7511, 2017 WL 4164172, at *6 (N.D. Ill. Sept. 20, 2017) (citations and internal quotation marks omitted). "An account stated claim is an alternate theory for proving damages in a breach of contract claim." *Id.* The parties dispute which invoices are at issue, thus precluding summary judgment

7

on this issue.[6]

4. Breach of Fiduciary Duty

Flair contends that Defendants' breach of fiduciary duty claim "has a total failure of proof on causation and damages" because Milisevic could not answer questions with respect to these issues at his deposition. (Flair's Mem. Supp. Summ. J., Dkt. # 196, at 15.) Flair concludes from his failure to answer that "Defendants cannot prove [either] one of the[se] elements of a breach of fiduciary duty claim." *Id*. Simply because Milisevic could not answer the questions does not mean that proof of causation and damages does not exist. These are matters for the jury.

**Conclusion**

For the reasons stated above, Flair's motion for summary judgment is denied.

Date: June 25, 2019

_____
**Ronald A. Guzmán**
**United States District Judge**

---

[6] While Flair's interpretation of the invoices at issue based on the language of the SAC is plausible, the SAC does not expressly set forth to which invoices Defendants refer. In any event, a party is permitted to amend its complaint to conform to the evidence presented at trial.

8